David and Renee Simon v. Commissioner.
Simon v. Commissioner
Docket No. 73722.
United States Tax Court
T.C. Memo 1961-251; 1961 Tax Ct. Memo LEXIS 101; 20 T.C.M. (CCH) 1309; T.C.M. (RIA) 61251; August 31, 1961
*101 Petitioner David Simon, a distributor of coin-operated amusement devices, conceived the idea for a bowling machine that could be played by two people. He submitted a rough sketch of a backglass for the game to a manufacturer of such devices, whose engineers designed a machine based on David's idea. David later assigned all his rights in the sketch and machine to the manufacturer for $55,000. David had conceived and sold numerous other ideas for coin-operated machines in the past and was still doing so at the time of trial. Held, the property sold was held by David primarily for sale to customers in the ordinary course of his business. Held, further, petitioners have failed to prove that the property sold had been held by them for more than 6 months. *102 Richard Z. Steinhaus, Esq., for the petitioners. Colin C. MacDonald Jr., Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax for the taxable year 1950 in the amount of $18,692.86. The only issue for decision is whether petitioners may treat the amount of $55,000 received by David Simon (hereinafter referred to as David) in 1950 from Universal Industries, Inc. (hereinafter referred to as Universal), as gain from the sale of a capital asset held for more than 6 months. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, timely filed a joint Federal income tax return for the calendar year 1950 with the collector of internal revenue for the third district of New York. David has been a distributor of coin-operated amusement devices for about 30 years. During the years 1949 and 1950, he was regional distributor for Universal, an Illinois corporation engaged in the manufacture and sale of such devices. His territory was the eastern seaboard, and he was responsible for distributing about 30 percent of *103 Universal's production. Coin-operated amusement devices, or pinball machines, have a comparatively short life; they lose popularity rapidly and soon become obsolete. Before the shuffle alley, a game played with a puck, was produced, Universal made about 10 to 15 different game machines each year. It was not customary for Universal to obtain patents on the design, that is, the outer appearance, of a particular machine because of its relatively short life. However, Universal did make application for patents on the electrical circuits or mechanical construction of certain game machines. David considered it part of his business to "feel the pulse" of the industry; that is, to keep abreast of the current demands of the public for new and different game machines and to know what new game was needed for his territory. It is not unusual for game machine distributors to evolve ideas for new games. David has conceived ideas for new game machines over the entire 30 years he has been in the distributing business. Some of these he sold and others were used by manufacturers without payment to David. When he was more active in the business than he was at the time of trial, as during the years *104 1949 and 1950, David was "pretty good" at thinking up and selling ideas. He was the originator of the four-player, a game machine that can be played by four people. David never reported any gain from the sale of his ideas as capital gain, except for the $55,000 which he received from Universal in 1950. David knew nothing whatever about the mechanical or electrical details of game machines. When he had an idea for a new game, he would go to the engineering department of a manufacturer of machines and describe his idea to its engineers. The engineers would then work on the electrical and mechanical details for such a game, discussing it from time to time with David until finally "a game is born." This sometimes took days, sometimes months, and sometimes years. In 1949, David saw advertisements in The Billboard, a trade paper, for shuffleboards, which were coin-operated game machines designed as table model bowling alleys. One was called "California Shuflepins," a machine produced in California which appeared to be a miniature bowling alley built at table height. Scoring for this game was done manually on a scoreboard located near the coin box. In the same paper was an advertisement *105 for an all-purpose scoring board for shuffleboard games. Apparently, this scoring board was a backglass (apparently the upright glass at the end of the machine opposite the playing end) for shuffleboard machines which could score in five different manners for as many as four players. The score was shown on the backglass; there was apparently no need for manual scoring. This board was called the "Genco's All Purpose Scoreboard." David noticed particularly the advertisement for the California Shuflepins and when the first model of the game arrived in New York City, went to look at it. He noticed that a person had to keep score with pencil and paper. He notified Universal that the game had some merit and that if it could be worked out mechanically, it would be an asset to the industry. The people at Universal told him to put his ideas in some form that they would know what he was talking about and bring it to the factory for further discussion. Under date of July 14, 1949, David wrote the following letter for the attention of the president of Universal: Universal Industries, Inc. 5737 North Broadway, Chicago, Illinois
Att.: Mel Binks Gentlemen: Undoubtedly you have seen the *106 billboard [sic] advertisement of "California Shuflepins". This is something like the idea I spoke to you about. As you know, my idea is a twin bowler operating like bowling so that two people can play. This will make for competition. The scoring will be mechanical. I am enclosing a sketch of my twin bowler idea. You are familiar with the wiring circuits. I am anxious to see you manufacture the game as soon as possible. I am sure we can get together on a price for my idea. Very truly yours, Dave Simon Enclosed with the letter were the advertisement for California Shuflepins and the drawing David had made. This drawing was crudely made; mechanical drawing instruments were not used. It was a rough drawing of a blackglass for a game machine drawn as follows: [illegible]
DOUBLE BOWLER
SUPER
100
200
300
10
20
30
40
50
60
70
80
90
1
2
3
4
5
6
7
8
9
STRIKE
2n PLAYER
SPARE
X
30
20
/
100
200
300
10
20
30
40
50
60
70
80
90
1
2
3
4
5
6
7
8
9 FRAMES 1 2 3 4 5 6 7 8 9 10 Game machines have been designed from rough sketches. At the time David suggested *107 his backglass for a two-player bowler, Universal was not then manufacturing a shuffle alley game which two persons could play. Sometime after July 14, 1949, employees in the engineering department of Universal began to design a shuffle alley game based on David's idea. They had to design all of the electrical and mechanical details of a machine. As finally produced, the twin bowler, as Universal's shufflegame was called, may have had a backglass similar to the one David had drawn. The drawings for the game machine were made by Universal's engineers, and models were made from these drawings. All this work was done independently of David, except for discussions he may have had with the engineers from time to time. In either late 1949 or early 1950, the president of Universal called David to inform him that Universal had agreed to his price [1] for his idea for a twin bowler and asked him to come to Chicago. On or about February 15, 1950, David signed the following document: KNOW ALL MEN BY THESE PRESENTS, that the undersigned does *108 hereby assign, transfer, set over and give unto UNIVERSAL INDUSTRIES, INC., all of the undersigned's right, title and interest to make, use and sell the amusement device known as "twin bowler" and all right, title and interest of the undersigned in and to the drawings and sketches of the said "twin bowler" for a consideration of FIFTY-FIVE THOUSAND ($55,000) DOLLARS, said sum to be payable at the option of the undersigned in cash on demand or by crediting said sum against amounts owed to UNIVERSAL INDUSTRIES, INC. by the undersigned or any of the corporations of which he shall own any of the voting stock. Dated, N. Y., February 15, 1950. /s/ Dave Simon DAVE SIMON Ultimate Findings The gain of $55,000 was realized from the sale of property or a property right held by David primarily for sale to customers in the ordinary course of his business. Petitioners have failed to prove that the asset sold was held by them for more than 6 months. Opinion Petitioners, who recognize that they have the burden of proving that the gain was from the sale of a capital asset held for more than 6 months, maintain that by the written assignment dated February 15, 1950, David sold a property *109 right in the amusement device known as the twin bowler which had come into being not later than July 14, 1949, when he reduced his idea or "invention" to a sketch from which anyone skilled in the art of design and "circuitry" of coin-operated amusement games could manufacture the machine, and sent it to Universal. They also maintain that the asset sold was not property held by them primarily for sale to customers in the ordinary course of their trade or business, and thus, the gain was realized from the sale of a capital asset held for more than 6 months within the meaning of section 117(a) of the 1939 Code, [2] effective for the calendar year 1950. *110 Respondent contends that petitioners have failed to prove that the asset sold constituted a capital asset within the meaning of section 117(a) and, even if it was a capital asset, the petitioners have failed to prove that it was held for more than 6 months prior to the sale. [3] We agree with respondent on both grounds. We believe that petitioners' own evidence affirmatively indicates that whatever David sold for $55,000 was held by him primarily for sale to customers in the ordinary course of his business and, therefore, was not a capital asset within the meaning of section 117(a). This is a question of fact that must be determined with respect to each individual in his own case from the evidence presented. (C.A. 3, 1958), affirming in part a Memorandum Opinion of this Court. The only evidence on the question here is David's testimony that it was a part of his job to "feel the pulse" to determine what games could be used in his territory, that throughout his career in the business of distributing coin-operated machines, he had conceived *111 ideas for a number of different machines, some of which he had sold to manufacturers and some of which had been "stolen" from him, and that this procedure is not unusual among distributors of coin-operated amusement devices. By his own statement, David "used to be pretty good" at getting ideas for new games, and even in the poor physical condition he was in at the time of trial, he was still conceiving and selling ideas. From David's testimony, it appears that the coin-operated amusement device business was one in which new types of game machines were constantly required to keep current with demands, that the distributor was in a position to observe what those demands were, that David considered that it was part of his business to keep abreast of the demands, and that the evolving of ideas for new machines which would be profitable in his business was a part of his business. It also appears that David made an effort to sell his ideas to manufacturers whenever possible and that he had had considerable success in doing so throughout his career. David's testimony indicates the regularity, continuity, and frequency of recurrence of sales of ideas with the intent to profit therefrom which *112 marks a trade or business. See . Certainly, it appears that the conception and sale of ideas for new games was an integral part or product of David's business whether or not it be considered a business separate and apart from his distributing business. Consequently, we have found as a fact that the gain of $55,000 was from the sale of property held by David primarily for sale to customers in the ordinary course of his business and was not a capital asset. But even if we assume that the gain realized was from the sale of a capital asset, we do not think petitioners have proved that the asset sold was held by them for more than 6 months. Both parties approach this issue on the premise that the sale took place on February 15, 1950, the date of the written assignment, [4] and that what was sold was an invention or something similar thereto, the only question being when the invention or property right therein came into being, thereby starting the holding period. For purposes of this opinion, we will make the same assumptions. *113 In , affd. (C.A. 3, 1940), this Court stated: The inventor's property right in his invention does not come into being upon his obtaining of a patent but exists prior to that time upon his reduction of an original invention to actual practice. * * * We think, therefore, that petitioners had a property right in each of the inventions which they had reduced to practice. These rights represented something of exchangeable value which the partnership possessed since it was able to exchange them for a valuable consideration. * * * The Diescher case was followed in , which involved the question of when petitioner's holding period for an invention began. The Court held there that petitioner had proven the completed conception of his invention, or the reduction of the invention to actual practice, before the critical date: by drawings made, signed, and dated by him, which drawings set forth the invention in sufficient detail to enable those skilled in the art to manufacture the invention and improvement without further application of the inventive *114 art. [5]
Both parties here rely on the Myers case. Petitioners claim that the rough sketch of a backglass for a two-player bowler game set forth his invention in sufficient detail to enable those skilled in the art of manufacturing coin-operated machines to manufacture the game without further application of the inventive art, and therefore the property right they sold came into being not later than July 14, 1949. They rely principally on the testimony of one of Universal's engineers who worked on the development of the twin bowler, who testified that he and others in the engineering department of Universal manufactured the twin bowler, based on the sketch submitted by David, without any additional *115 technical assistance from David. We do not think the evidence as a whole supports petitioners' claim that the property right they sold to Universal was sufficiently reduced to actual practice to have been in existence on July 14, 1949, and no other specific date is suggested by petitioners or the record. See . It is obvious that Universal would not have paid David anything for the sketch he submitted on July 14, 1949. The sketch was a rough drawing of a backglass alone. There were no details or explanations attached and no plans or even suggestions about the design of a playing board or electrical circuits, which would seem to be most important to the practical use of David's idea. David had never tried it to know whether it would work, compare , and, in fact, did not have sufficient knowledge of how these devices were manufactured to know what would be required to adapt his idea to practice. David testified that he sent the sketch in at the request of someone from Universal with whom he had discussed his idea and who had told him to put his idea down in some form so they could tell what he was *116 talking about and bring it in for further discussion. He also testified that he discussed the idea with officers and engineers of Universal subsequent to that time and that they made helpful suggestions and criticisms. In fact, it seems clear that David's idea had no practical value until after the engineers of Universal had applied their creative skill and knowledge with respect to coin-operated amusement devices to determine that David's idea could be adapted to practical use in a coin-operated machine. Prior to such time we do not think that David's invention was sufficiently reduced to practice to give birth to the property right which he later assigned to Universal. When the property right actually came into existence, we cannot determine from the record. We can only say that the record does not prove its existence on or prior to July 14, 1949, the date on which the rough sketch was sent to Universal and the only date specified by petitioners. Consequently, petitioners have not carried their burden of proving that the asset sold was held by them for more than 6 months, which is necessary in order for them to succeed in their claim here. Decision will be entered for the respondent. *117 Footnotes
1. The record does not disclose details of the time, place, or subject of any prior discussions David may have had with Universal about his idea.↩
2. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer; (Section 210(a), (c) of the Revenue Act of 1950, amending this section by also excluding from "capital assets" copyrights, etc., was effective only for taxable years beginning after September 23, 1950, and hence is not applicable here. All section references herein are to the 1939 Code prior to its amendment by the Revenue Act of 1950 unless otherwise specified.)↩
3. Respondent does not question that the amount received was from the sale of property.↩
4. David's testimony on the point is confused and somewhat conflicting, but it indicates that he may have verbally consummated a sale of his "invention" in either late 1949 or January 1950.↩
5. The Court relied on (C.A. 6, 1896), a patent interference case, for the above-quoted statement. While it occurs to the writer that the conception of a property right in an invention might require more tangible evidence for tax purposes than it would in an argument between two inventors as to who conceived the invention first, nevertheless, the quoted phraseology has been adopted and used in subsequent tax cases.↩